IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TOMMY KASALO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No.: 10 C 1643 |
| v. | ) | |
| | ) | Suzanne B. Conlon, Judge |
| NCSPLUS INCORPORATED and | ) | |
| GARY C. COOKE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECISION ON THE MERITS

Tommy Kasalo sues attorney Gary Cooke and debt collection agency NCSPLUS

Incorporated, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.

§ 1692 *et seq.* In December 2005, Kasalo incurred a debt to Williams & Associates for an

automobile sales training course. In November 2007, the unpaid balance was $88.26. In 2009,

NCSPLUS and Cooke sent Kasalo collection letters seeking to recover $1,020.03 on behalf of

creditor Allied Funding Group, who had purchased the delinquent debt from Williams &

Associates. After summary judgment, two claims remained for trial: whether defendants

misrepresented the amount of the debt in violation of § 1692e, and whether defendants attempted

to collect an unauthorized amount in violation of § 1692f. A bench trial was held on September

9, 2011. This memorandum opinion and order sets forth the findings of fact and conclusions of

law required by Fed. R. Civ. P. 52. Also pending is defendants' oral motion for a directed

verdict following the close of Kasalo's case, which the court construes as a motion for judgment

1

on partial findings under Rule 52(c). *See Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004) (directed verdicts under Rule 50(a) apply only in jury trials).

## I. Procedural History

The issues precluding summary judgment for defendants were narrow. The § 1692e claim alleged the amount to be collected was false because Kasalo did not owe the asserted $1,020.03. Summary judgment was denied on that claim because defendants failed to meet their initial burden to show the absence of a genuine dispute. Defendants failed to establish the debt amount reported to them was properly calculated, and their conclusory assertion without a record citation that Kasalo could not produce evidence of its falsity did not satisfy defendants' burden on summary judgment. The court was left with evidence of an $88.26 debt that ballooned to $1,020.03 in a little more than a year; this created a reasonable inference in Kasalo's favor that the amount of the debt included incorrect charges.

The § 1692f claim alleged the amount of interest charged on the debt was unlawful. The court noted it was an open question in this circuit whether § 1692f applies if it is the creditor, not the debt collector, who applies an unlawful interest rate and places that incorrect amount for collection. It was unnecessary to decide the question because defendants presented no admissible evidence that Allied Funding Group actually placed $1,020.03 for collection. Cooke's affidavit stating the amount Allied Funding Group placed for collection was deemed hearsay because he learned the information from Kasalo's file at NCSPLUS. The affidavit of NCSPLUS' vice president was inadmissible to prove the amount of debt placed for collection because it violated the best evidence rule; the affidavit attested to information learned from a document, which was not submitted to the court. The unexplained 1,000% increase supported a reasonable inference in

2

Kasalo's favor that a usurious interest rate was applied, and there was no evidence about who among Williams & Associates, Allied Funding Group, or NCSPLUS added to the $535.02 charge reported by Williams & Associates in April 2008.

The court also denied summary judgment on defendants' affirmative defense of a *bona fide* error under § 1692k(c). Defendants asserted they were allowed to rely on Allied Funding Group's representation of the amount owed. Setting aside defendants' evidentiary problems in proving the amount placed for collection, defendants submitted no evidence that they employed procedures reasonably adapted to prevent an attempt to collect an incorrect amount.

## II. Findings of Fact

Kasalo is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3). NCSPLUS is a debt collection agency, and Cooke is an attorney employed by NCSPLUS to assist in debt collections. Both NCSPLUS and Cooke meet the definition of debt collector in the FDCPA, 15 U.S.C. § 1692a(6).

On December 1, 2005, while employed at Grossinger Toyota Dealership, Kasalo signed an agreement to pay $589 to Williams & Associates in exchange for an automobile sales training course. The agreement provided that Kasalo would pay all attorney's fees and reasonable collection costs if he defaults. The same day, he signed a promissary note/payroll deduction authorization. The promissary note authorized the cost of the course to be deducted directly from Kasalo's paycheck, divided over the course of six pay periods. The note specified an interest rate of 28% per year. In the event that Kasalo left his employer, the remainder of the balance would be deducted from his final paycheck, and Kasalo remained responsible for any unpaid balance. If

Kasalo failed to make a payment when due, the entire principal balance and accrued interest may be immediately due and payable.  Any overdue payment would accrue interest at the rate of either 28% per year or the maximum permitted by law, whichever is lower.  Kasalo agreed to pay all costs of collection, including reasonable attorney fees, in the event the note was not promptly paid.

Kasalo left Grossinger's employment soon after he took the training course.  Grossinger signed Kasalo's last paycheck of $500.74 over to Williams & Associates on December 29, 2005, leaving a balance of $88.26 for the training course.  The record is devoid of any attempts to collect the remaining balance until November 27, 2007, when Williams & Associates sent Kasalo a statement reflecting a balance of $88.26 and seeking payment of $29.42.  The statement noted that a $25 fee would be charged for each late payment and a finance charge of 1% per month would be added to unpaid balances.  Kasalo did not pay.  The account balance then increased sharply.  Statements from Williams & Associates in the record reflect the following balances:

| | |
|---|---|
| December 28, 2007 | $401.18 |
| January 10, 2008 | $430.60 |
| February 28, 2008 | $485.02 |
| March 26, 2008 | $510.02 |
| April 25, 2008 | $535.02 |

Kasalo did not make any payments in response to these statements.  Williams & Associates eventually sold the delinquent debt to Allied Funding Group, which placed the account with NCSPLUS for collection in January 2009.

NCSPLUS sent Kasalo collection letters seeking $1,020.03 on January 9, February 12, February 26, and March 19, 2009.  Cooke sent Kasalo a collection letter on March 12, 2009, in

4

his capacity as an attorney at law, seeking to collect $1,020.03. After Kasalo received the Cooke

letter and the last NCSPLUS letter, he contacted an attorney, who in turn contacted Cooke to

dispute the debt. NCSPLUS sent Allied Funding Group two requests for documentation of the

debt; both went unanswered. NCSPLUS ceased collection efforts.

At trial, Kasalo testified that he incurred a debt with Williams & Associates, but the

unpaid balance was only $88.26. He was surprised that the balance had increased to more than

$1,000 in a little over two years. He testified about the distress he felt when he received

NCSPLUS and Cooke's collection letters, which came at a time when he was pursued by other

creditors for other debts. He became depressed over the amount of the debt and could not

believe the claimed balance. On cross-examination, Kasalo was questioned whether he could

distinguish the distress he felt from NCSPLUS and Cooke's letters from the distress he felt from

other collection agency letters. Kasalo responded that he was testifying about how he felt when

he received the NCSPLUS and Cooke letters. The court finds Kasalo's testimony to be credible

but irrelevant to the legal issues regarding liability.

The vice president of NCSPLUS, Lynn Goldberg, testified for the defense. He explained

NCSPLUS' collections process. A creditor may place an account for collection in one of two

ways. NCSPLUS has a form on its website, allowing a creditor to place a claim by manually

entering a debtor's name, personal information, and known employment information, the amount

of the debt, and the claim date. Alternatively, a creditor may send an electronic file containing a

spreadsheet of accounts (presumably listing the same information listed above). The information

from the spreadsheet is uploaded electronically into NCSPLUS' system. NCSPLUS checks each

account for one error: whether the debtor is linked to the right creditor.

Then, NCSPLUS begins phase one of its two-part collections system. Phase one is a

prepaid collection service. NCSPLUS sends the debtor a series of collection letters and instructs

the debtor to pay the creditor directly. In phase one, NCSPLUS does not add interest or fees to

the amount reported by the creditor. If the creditor is paid, NCSPLUS is notified and ceases

collection efforts. If phase one is unsuccessful, NCSPLUS proceeds to phase two. In phase two,

collection efforts intensify to include telephone calls and possibly litigation, interest is added to

the debt, and debtors pay NCSPLUS directly. Upon successful collection, the creditor pays

NCSPLUS an additional collection fee based on the amount recovered.

Goldberg testified about the policies and procedures in place to prevent NCSPLUS from

attempting to collect an incorrect debt amount. NCSPLUS uses a form contract with all client-

creditors. NSCPLUS' agreement with Allied Funding Group is in the record. On direct

examination, Goldberg testified that Allied Funding Group checked "yes" in the box requiring

client-creditors to certify compliance with the FDCPA. On cross-examination, Goldberg

clarified that the box states clients agree that if they want to litigate a claim, they will comply

with the rules of the FDCPA. On direct examination, Goldberg also pointed to language on the

back of the form contract as further procedures to prevent error. NCSPLUS offers a money-back

guarantee if a client recovers less than promised in phase one. The guarantee applies only to

"qualifying" accounts, defined in part as accounts where the debtor "legally owe[s]" the debt. On

cross-examination, Goldberg admitted that the information about qualifying and nonqualifying

loans pertain only to whether the money-back guarantee applies and not to accounts in general.

NCSPLUS does not require an itemization from creditors of how the amount reported for

collection was obtained. Goldberg's business model is to trust clients to tell the truth, and he

does not question the accuracy of the debt amounts reported. He testified that it does not make

business sense for NCSPLUS to inflate the amount of the debt, but he did not testify about

whether it would make business sense for creditors to fudge the amounts owed.

Goldberg testified that all accounts are available for viewing online. Client creditors have

a password to view their accounts and can report any errors, such as a misspelling. Clients go

online to report payments received, to inform NCSPLUS to discontinue a collection, or to adjust

a balance.

When asked specifically about Kasalo's account, Goldberg testified that NCSPLUS

received the account information on a spreadsheet from Allied Funding Group. Other than the

spreadsheet, which was not produced at trial, NCSPLUS had no other documentary evidence or

verified statement from Allied Funding Group that Kasalo owed $1,020.03 when the account was

placed for collection. The notations in Kasalo's electronic file reflect that his account did not

proceed past phase one. When asked about the contract evidencing the underlying debt between

Kasalo and Williams & Associates, Goldberg stated that NCSPLUS did not have a copy of

Kasalo's note before any of the collection letters were sent. Goldberg was impeached on this

statement by Cooke's testimony. Cooke testified that he signed an affidavit swearing that he

reviewed the promissary note between Kasalo and Williams & Associates before sending Kasalo

a letter. Cooke stated that when he signed the affidavit he believed he had reviewed the contract

before taking action, and he was surprised to hear Goldberg's testimony that NCSPLUS did not

have the contract at that time. He could not explain it.

The court finds Goldberg's testimony only partially credible. Goldberg was credible

while testifying about NCSPLUS' general practices in phase one and phase two of its collection

7

system and explaining what the notations in Kasalo's account mean. But he was not credible in otherwise testifying about Kasalo's account. The court is faced with a conflict regarding when NCSPLUS was in possession of the underlying promissary note or agreement. The documents' presence (or absence) at NCSPLUS has not been explained. Goldberg testified that all that is necessary to open a collection account is an online submission or electronic spreadsheet of accounts; no documentation is requested. He did not testify about why clients would send documentation before verification of the debt is requested. Allied Funding Group did not respond to NCSPLUS' debt verification requests, a logical time to provide the documents. The court concludes that Goldberg's testimony about Kasalo's account, beyond what is known through the file itself, is not credible or reliable. Nor does the court accord weight to Goldberg's interpretation of the contract between NCSPLUS and Allied Funding Group.

### III. Conclusions of Law

After Kasalo testified and rested his case, defendants moved for a directed verdict. They argued Kasalo did not produce evidence as to the amount of money he owes and therefore did not prove defendants sought to collect an incorrect amount. In a bench trial, the equivalent to a directed verdict is judgment on partial findings. FED. R. CIV. P. 52(c); *Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Constr. Corp.*, 13 F.3d 253, 257 n.3 (7th Cir. 1994). In a bench trial, the court may enter judgment against a plaintiff at the close of his case if it finds against the plaintiff on an issue central to proving his case. FED. R. CIV. P. 52(c). Unlike the standard for a directed verdict in a jury trial, the court may make credibility determinations and find facts adverse to Kasalo, the nonmoving party. *Rego v. ARC Water Treatment Co. of Penn.*, 181 F.3d 396, 400 (3d Cir. 1999). The court may reserve ruling until the close of evidence. FED. R. CIV.

8

P. 52(c); *Int'l Union*, 13 F.3d at 257. The defendants waived the right to dismissal under Rule

52(c) by putting on evidence in defense. *Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 451

n.29 (7th Cir. 2006). The court evaluates all the evidence presented at trial, and the Rule 52(c)

motion is subsumed with the evaluation of the case as a whole.

## A. § 1692e

Section 1692e(2) prohibits the false representation of the amount of a debt. To prevail on

a false representation theory, Kasalo must prove the statement is both false and material. *Hahn v.*

*Triumph P'ships LLC*, 557 F.3d 755, 757–58 (7th Cir. 2009). The total amount of debt owed is

clearly material, so the only issue is whether Kasalo in fact legally owes $1,020.03. A debt

collector need not know the amount is incorrect to violate the FDCPA. *Randolph v. IMBS, Inc.*,

368 F.3d 726, 730 (7th Cir. 2004). Even an unintentional violation may support liability. *Turner*

*v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003); *Gearing v. Check Brokerage*

*Corp.*, 233 F.3d 469, 472 (7th Cir. 2000).

Kasalo has not met his burden to prove by a preponderance of the evidence that the

amount NCSPLUS and Cooke sought to collect was false. The difference between the evidence

at summary judgment and the evidence at trial is the agreement and promissary note. None of

defendants' Rule 56.1 statements attempted to explain the increasing balance, and the 1,000%

increase supported a reasonable inference that the increase was incorrect. At trial, defendants

questioned Kasalo about the documents he signed, agreeing to pay collection costs and attorneys

fees in the event of a default. Collection costs and attorneys fees could reasonably explain the

steep increases.[1] It is true that Williams & Associates or Allied Funding Group could have included unauthorized fees, charged an unlawful interest rate, or made a calculation error. But Kasalo submitted no evidence of the breakdown of the charges, nor has he explained why this information was unavailable. Instead, he looks to NCSPLUS to justify the amount charged, improperly placing the burden of proof on defendants to show the amount of indebtedness was not false.

**B. § 1692f**

Section 1692f prohibits debt collectors from using unfair or unconscionable means to collect a debt. Subsection (1) specifically forbids collecting interest unless that amount is expressly authorized by the debt agreement or permitted by law. Kasalo argues the interest charged on the underlying debt violates Illinois usury laws, 815 ILCS 205/1 *et seq.*, which set a maximum interest rate of 9% on written contracts. (The situations in which a higher interest rate may be charged are not contended to apply here.) There are two problems with this argument. First, although the promissory note stated that a rate of 28% interest applied to the unpaid balance from the date of the agreement, no evidence suggests that rate was actually applied before default. The November 2007 statement from Williams & Associates reflects a $88.26 balance, unchanged from December 2005. The promissory note's fine print states that upon default the interest rate would be either 28% or the maximum allowed by law. The record shows the

---

[1] At trial, Kasalo argued attorney's fees could not legally be part of the amount sought to be collected because only a court can determine reasonable attorney's fees. However, the Seventh Circuit is clear that "when a debtor has contractually agreed to pay attorneys' fees and collection costs, a debt collector may, without a court's permission, state those fees and costs and include that amount in the dunning letter." *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565 (7th Cir. 2004); *see Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 598–99 (7th Cir. 2004).

balance increased only after default. Kasalo presented no evidence of the interest rate actually applied.

Second, the court concludes that § 1692f(1) applies only if the *debt collector* adds interest or fees, not if the *creditor* improperly calculated the amount owed. Although the Seventh Circuit has not held so explicitly, this interpretation comports with the rest of § 1692f to focus on the debt collector's post-assignment actions. It is true that the language of § 1692f(1), which disallows "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law," seemingly encompasses any situation where the balance includes improper interest charges, regardless who added them. But § 1692f focuses on the debt collector's conduct and the means used to collect. *Turner*, 330 F.3d at 996; *Allen ex rel Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir. 2011). Other examples given in § 1692f relate to the actions of debt collectors during the collections process, as opposed to errors in the information received from the creditor, which are covered in § 1692e. *E.g.*, 15 U.S.C. § 1692f(2)–(4) (rules governing postdated checks to pay debt); § 1692f(5) (forbidding tricking debtor into incurring charges, such as for collect calls, during collection); § 1692f(7)–(8) (restricting external identification of mail as collection attempts). Furthermore, in *Turner*, 330 F.3d at 996–98, the Seventh Circuit held that simply sending a collection letter that otherwise complies with the FDCPA but attempts to collect a debt that was discharged in bankruptcy did not violate § 1692f. The *means* the debt collector used—sending a letter that provides the information required by the FDCPA—was not unfair or unconscionable, even if the debt collector may have violated § 1692e by misrepresenting the legal status of the debt. *Id.* at

11

998–99. Just so here: if a debt collector sends a collection letter that otherwise complies with the FDCPA but reports a debt that the creditor miscalculated, the debt collector may be liable under § 1692e, but not § 1692f. Other cases discussing possible violations of § 1692f pertain to charges added and actions taken by debt collectors after the account was placed for collection. *See Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 365-66 (3d Cir. 2011) (debtor stated a claim under § 1962f when debt collector allegedly added unauthorized charges for its own attorney fees and costs); *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 612–14 (6th Cir. 2009) (debt collector generated document evidencing debt that appeared to be credit card statement but was not a copy of actual statement); *Seeger v. AFNI, Inc.*, 548 F.3d 1107, 1111–13 (7th Cir. 2008) (debt collector added 15% collection fee on top of amount reported by creditor); *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008) (debt collector added attorney's fees per creditor's instructions to second letter regarding debt). *But see Owen v I.C. Sys., Inc.*, 629 F.3d 1263, 1273 (11th Cir. 2011) (assuming without deciding that debt collector violated § 1692f by "indiscriminately accept[ing creditor's] interest charges as factually accurate and proceed[ing] to collect them").

Kasalo must prove by a preponderance of the evidence that NCSPLUS or Cooke added charges to the amount reported by Allied Funding Group and that those charges were unauthorized. Defendants submitted the affidavit of Allied Funding Group's president, stating that the company purchased the debt of $1,020.03 from Williams & Associates and placed that amount for collection with NCSPLUS. If true, Kasalo cannot show NCSPLUS or Cooke added any charges. However, he objected to the affidavit as violating the best evidence rule. FED. R. EVID. 1002. He argued Allied Funding Group's president learned the balance from a document,

12

which was not provided. Defendants failed to respond. It is unnecessary for the court to rule on this issue because, even if the affidavit is excluded, Kasalo has not met his burden on this claim.

As of April 2008, the debt to Williams & Associates was $535.02. The increase to $1,020.03 by January 2009 is unexplained in the record, suggesting a reasonable inference that NCSPLUS could have added charges. However, Goldberg testified credibly that at phase one of the collections process, NCSPLUS does not add charges to a balance placed for collection, and Kasalo's account never proceeded beyond phase one. Kasalo did not offer evidence rebutting this assertion. Based on the unrebutted general practices of NCSPLUS, the court concludes that neither NCSPLUS nor Cooke added charges to the balance Allied Funding Group placed for collection.

## C. § 1692k

The FDCPA provides debt collectors an affirmative defense to avoid liability. The *bona fide* error defense applies if the debt collector proves by a preponderance of the evidence that the violation (1) was unintentional, (2) resulted from a *bona fide* error, and (3) occurred despite procedures in place reasonably adapted to avoid the error. 15 U.S.C. § 1692k(c); *Randolph v IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).

Because the court did not find an FDCPA violation, it is unnecessary to decide whether the affirmative defense applies. Nor can the court rely on the affirmative defense as an alternative holding because it does not give weight to Goldberg's undocumented testimony about NCSPLUS' procedures to prevent collecting invalid debt amounts.

NCSPLUS' form contract does not require a creditor to place only accounts that are valid and legally due. *See Turner*, 330 F.3d at 995–96 (suggesting that debt collectors have an

13

agreement with creditor-clients that debts are current as part of reasonable preventative measures); *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997) (defendants' reasonable preventative measures included that client verify under oath that each charge true and correct). Nor did defendants present evidence about how frequently NCSPLUS' clients report incorrect amounts. *See Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) (noting "only .01% of accounts referred for collection are later learned to be in bankruptcy"). The requirement that an account be legally owed is mentioned only in relation to whether the account would qualify for a refund. This suggests NCSPLUS anticipates that not all accounts are legally owed. The requirement that a creditor litigate according to the FDCPA is similarly unhelpful because not all accounts proceed to phase two, in which litigation may occur. The specific contract between Allied Funding Group and NCSPLUS did not authorize NCSPLUS to automatically transfer all uncollected accounts to phase two. Finally, although Goldberg testified that it does not make business sense for *NCSPLUS* to inflate charges, he said nothing about *creditors* inflating charges—especially creditors like Williams & Associates that sell bad debts and collect some money on the debt regardless of the amount recovered from the debtor.

## IV. Conclusion

Kasalo failed to meet his burden to prove by a preponderance of the evidence that he did not owe $1,020.03 or that NCSPLUS or Cooke added unauthorized charges to the balance. Accordingly, judgment is entered in favor of NCSPLUS and Cooke and against Kasalo on all counts.

ENTER:

Suzanne B. Conlon
United States District Judge

October 4, 2011